UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

HENRY B. LINES, III,

              Plaintiff,              **MEMORANDUM OF DECISION AND ORDER**
    -v.-                                          04-CV-2517 (DRH)(ETB)

CABLEVISION SYSTEMS CORPORATION and
AMERICAN MOVIE CLASSICS NETWORK,

              Defendants.
_____

**Appearances:**

**For the Plaintiff:**
**Robert W. Ottinger**
The Ottinger Firm, P.C.
Southstreet Seaport
19 Fulton Street, Suite 400
New York, New York 10038

**For the Defendants Cablevision Systems Corporation and American Movie Classics Network:**
**Amber Kagan**
Morgan Lewis & Bockius, LLP
101 Park Avenue
New York, New York 10178

**HURLEY, District Judge:**

        Presently before the Court is the motion by defendants Cablevision Systems Corporation ("Cablevision") and American Movie Classics Network ("AMC") (collectively, "Defendants") to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is granted.

## BACKGROUND

        The relevant facts alleged by plaintiff Henry B. Lines, III ("Plaintiff"), which are accepted as true for purposes of this motion, are as follows. On May 21, 2001, Plaintiff was

hired as Assistant Director of Marketing for AMC, which is part of the Rainbow Media Group, a subsidiary of Cablevision. (Am. Compl. ¶ 6.) As Assistant Director of Marketing, Plaintiff "had very little independent authority" and "was not given any signing authority or authority to approve expenses or invoices." (*Id.* ¶ 7.) In January 2003, Cablevision began an internal investigation of AMC after learning that an employee other than Plaintiff had falsified an invoice. (*Id.* ¶ 8.) On two occasions, Plaintiff was questioned by an investigative panel about the department's practice of pre-paying vendor expenses at the end of the calendar year rather than including the expenses in the following year's budget. (*Id.* ¶ 9.) During this investigation, Plaintiff informed the panel that he did not know of and was not responsible for any wrongdoing and that all of his actions were done at the direction of his supervisor. (*Id.* ¶ 10.)

On June 18, 2003, Cablevision informed Plaintiff that he was being terminated due to the accounting investigation. (*Id.* ¶ 11.) Thirteen other employees were also terminated, including AMC's President, Kate McEnroe. (*Id.* ¶ 12.) That same day, Cablevision disseminated a press release (the "Press Release") reporting the internal investigation of "improper expense accruals" at the national services division of Cablevision's Rainbow Media Group. (*Id.* ¶ 13.) The release stated that "[t]he company [Rainbow Media Group] said that i[t] has terminated 14 AMC employees including the president of the AMC division in connection with the company's review of this matter." (*Id.* ¶ 13.) The Press Release made reference to an ongoing investigation by outside forensic accountants who were investigating 6.7 million dollars' worth of improper accruals. (*Id.*) The release stated that the investigation stemmed from an internal invoicing problem. (*Id.*) Thereafter, the news media began printing articles about the ongoing AMC accounting investigations. (*Id.* ¶ 14.) On June 19, 2003, Multichannel

News, a trade magazine, ran a front page story entitled "AMC Under Fire: McEnroe, 13 others cut loose after Rainbow audit finds 'improper accruals.'" (*Id.* ¶ 15.) The article went on to say that "certain employees" at Rainbow had "fabricated invoices" and named Plaintiff as one of the individuals terminated because of the investigation. (*Id.*)

Broadcasting & Cable, another trade magazine, released an article on June 23, 2003 entitled "AMC Scandal: Rainbow's movie channel boss Kate McEnroe, 13 others canned in alleged accounting scam." (*Id.* ¶ 16.) The article went on to say "Accounting scam backfired on McEnroe, 13 other AMC, WE execs" and subsequently identified Plaintiff by name. (*Id.*)

Over the next month, Multichannel News ran seven more articles about the AMC "scandal" and the investigation was also covered by Newsday, the New York Times, the New York Post, and the New York Daily News. (*Id.* ¶ 17.) By July 2003, the Securities and Exchange Commission (the "SEC") had launched an investigation into the accounting scandal. (*Id.* ¶ 18.) In December 2003, Plaintiff was questioned by investigators from the SEC. (*Id.* ¶ 19.) Plaintiff cooperated fully and was never accused of any criminal wrongdoing. (*Id.*)

Since being terminated, Plaintiff has tried unsuccessfully to find other employment within the telecommunications and entertainment industry. (*Id.* ¶ 20.) At least two potential employers have informed Plaintiff that they will not hire him because his name was associated with the accounting scandal. (*Id.*) Thus, Plaintiff alleges that as a result of the "widely publicized accounting scandal at AMC, Plaintiff's reputation within his trade has been tarnished." (*Id.* ¶ 21.)

Plaintiff asserts one cause of action, "for tort established in New York law by *Singer v. Jefferies & Co., Inc.*," 553 N.Y.S.2d 346 (1st Dep't 1990). (*Id.* ¶ 22.) Plaintiff alleges

that "Defendants have falsely blamed Plaintiff for its own misconduct and tarnished plaintiff's reputation in the industry. As a result of defendants' conduct plaintiff has been unable to obtain employment in his profession." (*Id.* ¶ 23.)

**DISCUSSION**

The court may not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Aetna Cas. and Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 604 (2d Cir. 2005). The Court must accept all factual allegations in the proposed complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999); *Jaghory v. New York State Dep't. of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997).

I.  **Plaintiff's Purported *Singer* Claim Fails to State a Claim as a Matter of Law**

   A.  ***Singer v. Jefferies & Co.***

Plaintiff contends that his claim for "tort" is based on the principles of New York law enunciated by the First Department in *Singer*. Singer was employed by defendant Jefferies & Co. as a Senior Vice President in the corporate finance department. 553 N.Y.S.2d at 347. Following the instructions of the Chief Executive Officer (the "CEO") of Jefferies & Co., Singer dictated and signed a $3,000,000.00 invoice for services rendered to the Ivan F. Boesky Corporation. *Id.* Eighteen months later, Singer left Jefferies & Co. and joined Salomon Brothers as a Vice President. *Id.* In November 1986, Singer was subpoenaed for information by the SEC relating to the Ivan Boesky insider trading investigation. *Id.* Salomon Brothers reviewed the subpoena, which specifically asked about the invoice Singer had signed, and days later, requested Singer's resignation. *Id.* Singer was later exonerated of any wrongdoing but was not

rehired by Salomon Brothers. *Id.* He sustained a prolonged period of unemployment and eventually accepted a position with another firm at a significantly lower salary. *Id.*

Singer brought suit against Jefferies & Co. and its CEO alleging that "he had been injured in his trade and profession *and* had suffered injury to his reputation." *Id.* at 348 (emphasis in original). The First Department found that Singer stated a cause of action sounding in tort that could not be "precisely catogorize[d]." *Id.* Rather, the claims asserted by Singer were analogous "to a variety of torts including, but not limited to, fraud and misrepresentation, malicious prosecution and breach of contract." *Id.* The court specifically noted that the action "appear[ed] to meet the elements of fraud." *Id.* at 349 n.1.

The First Department rejected defendants' attempts to construe the action as one for defamation. Citing the New York Court of Appeals decision in *Morrison v. National Broad. Co.*, 19 N.Y.2d 453 (1967), which set forth the standard for determining when a claim will be deemed one for defamation, the *Singer* court stated: "unlike the plaintiff in *Morrison*, the plaintiff herein is not seeking recovery for damages solely because of injury to his reputation, nor does he assert that *defendants* released information which communicated to the public that he was involved in criminal activity." *Id.* at 348 (emphasis in original). Thus, the court held that the six year statute of limitations period for fraud applied rather than the one year limitations period for defamation. *Id.* at 349.

### B. *Application of Singer to the Instant Facts*

In the present case, Plaintiff alleges that "Defendants have falsely blamed Plaintiff for its own misconduct and tarnished plaintiff's reputation in the industry. As a result of defendants' conduct plaintiff has been unable to obtain employment in his profession." (Am.

Compl. ¶ 23.) In his memorandum of law in opposition to Defendants' motion, Plaintiff asserts that he is not bringing a defamation claim. (*See* Pl.'s Mem. at 3, 5.) Rather, Plaintiff contends that the sole basis for his claim is the tort established by *Singer*. For the reasons stated below, Plaintiff's claim cannot be sustained.

As an initial matter, *Singer* did not create a new, catch-all cause of action. In fact, the few cases citing *Singer* in the fifteen years since it has been decided have universally concluded that *Singer* did not create a catch-all tort. *See John Street Leasehold, LLC v. Capital Mgmt Resources, L.P.*, 154 F. Supp. 2d 527, 545 (S.D.N.Y. 2001) ("*Singer* did not create a new, catch-all cause of action for 'unspecified tort,' but only indicated that certain allegations can be sustainable as tort actions if they are sufficiently analogous to an established tort action."), *aff'd*, 283 F.3d 73 (2d Cir. 2002); *Eavzan v. Polo Ralph Lauren Corp.*, 40 F. Supp.2d 147, 152 (S.D.N.Y. 1998) ("*Singer* did not create a new catch-all cause of action, but merely held that the plaintiff's allegations could be analogized to various claims and therefore stated a valid cause of action."); *Menaldi v. Pay-Per-View Network, Inc.*, No. 97 Civ. 6451, 1998 WL 230994, at *2 n. 4 (S.D.N.Y. May 5, 1998) ("[T]he court in *Singer* did not create a new catch-all cause of action, but merely held that since the claims asserted by plaintiff were analogous to various claims, including fraud, the plaintiff had stated a cognizable cause of action. Indeed, the court noted that the facts pleaded appeared to meet the elements of fraud."), *aff'd sub nom.*, *Menaldi v. Group W Broadcasting, Inc.,* 182 F.3d 900, 1999 WL 486978 (2d Cir. July 9, 1999).

Even assuming arguendo that *Singer* did create a catch-all tort, Plaintiff may not allege such a claim for the purpose of circumventing the pleading requirements of another cause of action. *See Eavzan*, 40 F. Supp. 2d at 152 ("[T]he tort of malicious prosecution adequately

embraces Eavzan's allegations . . . , making a *Singer* analysis inappropriate. Eavzan's second count is nothing more than an attempt to circumvent the obstacles to his malicious prosecution claim, and the court will not accept Eavzan's reformulation of the same facts into a separate cause of action."); *Balderman v. American Broad. Cos.*, 738 N.Y.S.2d 462, 469-70 (4th Dep't 2002) ("Regardless of the label plaintiff places upon it, . . . this cause of action is indistinguishable from the defamation cause of action."). Indeed, in addressing precisely this issue, one court has stated:

> Thus, even accepting the concept of a "general tort" for purposes of this motion, plaintiff's claim for general tort is, in reality, one for defamation. As the First Department has held, 'It would make little sense to hold that plaintiff may not prevail on a cause of action, having failed to establish certain elements, which are essential thereto, and then in the exercise of flexibility, apply a different name to it, and without correcting any of the fatal defects, permit the cause of action (absent a unique quality) to stand.

*O'Brien v. Alexander*, 898 F. Supp. 162, 173 (S.D.N.Y. 1995) (quoting *Belsky v. Lowenthal*, 405 N.Y.S.2d 62, 65 (1st Dep't), *aff'd,* 47 N.Y.2d 820 (1978)), *aff'd*, 101 F.3d 1479 (2d Cir. 1996). Thus, in *O'Brien*, plaintiff's claim for "general tort" was dismissed for the same reasons his defamation claim was dismissed. *Id.* at 174.

Here, despite Plaintiff's protestations to the contrary, a plain reading of the allegations reveals that Plaintiff's claim sounds in defamation. The gravamen of the Amended Complaint is the Press Release issued by Cablevision and the subsequent news reports, in which Plaintiff claims to have been "falsely blamed" for inappropriate expense accruals. (Am. Compl. ¶ 23.) Plaintiff further alleges that as a result of being "falsely blamed," his "reputation within his trade has been tarnished." (*Id.* ¶ 21.) Unlike Singer, who was injured by the defendants' fraudulent activities that led the court to apply the statute of limitations for fraud, Plaintiff's

injuries derive not from his involuntary involvement in Defendants' allegedly fraudulent schemes, but from the alleged defamatory statements made about him. In fact, in *Singer*, unlike this case, there was no communication made by the defendants. Thus, the *Singer* court specifically rejected defendants' attempts to construe the action as one for defamation because Singer did not allege that defendants published any defamatory statements about him. 553 N.Y.S.2d at 348.

In *Morrison*, the New York Court of Appeals addressed when a claim will be deemed one for defamation. In that case, the lower court concluded that plaintiff's claim was for an "intentional wrong" as opposed to defamation and applied a longer statute of limitations. 19 N.Y.2d at 458. The Court of Appeals disagreed, holding that it looks "for the reality, and the essence of the action and not its mere name." *Id.* at 459. In quoting the Restatement of Torts, the Court focused on two elements: (1) whether there was a "'communication'" (2) which "'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Id.* at 458. The Court went on to find that unlike most torts, "defamation is defined in terms of the injury, damage to reputation, and not to terms of the manner in which the injury is accomplished." *Id.*

In this case, as in *Morrison*, Plaintiff claims that his reputation in the industry was damaged because of an alleged wrongful communication, i.e., the Press Release and subsequent media reports. Accordingly, as in *Morrison*, this case sounds in defamation and Plaintiff may not avoid the obstacles in bringing that claim by stating a purported general tort. *See O'Brien*, 898 F. Supp. at 173 (finding that plaintiff's claim, which derived from "the alleged defamatory statements made about him" sounded in defamation); *Balderman*, 738 N.Y.S.2d at 470 (holding

that intentional tort claim should be dismissed as duplicative of defamation claim because "plaintiff seeks damages only for injury to his reputation"); *Goldberg v. Sitomer, Sitomer & Porges*, 469 N.Y.S.2d 81, 82 (1st Dep't 1983) (finding that "claims in the complaint in reality are claims for defamation" as "the entire injury complained of by plaintiff flows from the effect on his reputation"), *aff'd*, 63 N.Y.2d 831 (1984); *Noel v. Interboro Mut. Indem. Ins. Co.*, 295 N.Y.S.2d 399, 400 (1st Dep't 1968) (finding that despite name plaintiff gave cause of action, allegations that "defendants wilfully and maliciously issued, published and widely circulated a bulletin designed intentionally to discredit and harm the plaintiff" pleaded action for defamation), *aff'd*, 29 N.Y.2d 743 (1971). Thus, the Court turns to an analysis of whether Plaintiff has stated a claim for defamation.

## II.     *Plaintiff has Failed to State a Cause of Action for Defamation*

A claim for defamation is actionable under New York law if the defendant made (i) a false and (ii) defamatory (iii) statement of fact (iv) of and concerning the plaintiff (v) with the required degree of fault and (vi) special damages or per se liability. *See Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). To satisfy the "of and concerning" requirement, "an individual plaintiff must be clearly identifiable." *Abramson v. Pataki,* 278 F.3d 93, 102 (2d Cir. 2002). Thus, under the "group libel doctrine," a defamation claim is "insufficient if the allegedly defamatory statements referenced the plaintiff solely as a member of a group." *Id.* (quoting *Church of Scientology Int'l v. Time Warner, Inc.*, 806 F. Supp. 1157, 1160 (S.D.N.Y. 1992), *aff'd*, 238 F.3d 168 (2d Cir. 2001)).

Here, the only allegedly defamatory statement Plaintiff attributes to Cablevision is contained in the Press Release. (Am. Compl. ¶ 13.) The Press Release stated that "[t]he

company [Rainbow Media Group] said that i[t] has terminated 14 AMC employees including the president of the AMC division in connection with the company's review of this matter." (*Id.*)  In order to overcome the group libel doctrine, a plaintiff must demonstrate that "'the circumstances of the publication reasonably give rise to the conclusion that there is a particular reference to the member.'"[1] *Church of Scientology*, 806 F. Supp. at 1160 (quoting Restatement (Second) of Torts, § 564A(b)).  In the instant case, Plaintiff cannot demonstrate that Cablevision's citation to "14 AMC employees" reasonably gives rise to the conclusion that it particularly referenced Plaintiff.[2]  Accordingly, any defamation claim cannot be sustained.  *See Abramson*, 278 F.3d at 102-03 ("[W]hile there were repeated references to corruption among Javits Center workers, none of the individual appellants was directly or impliedly identified. The appellants have therefore clearly failed to demonstrate the essential element of specific reference.").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is GRANTED.  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.
September 21, 2005

/s
Denis R. Hurley,
United States District Judge

---

[1] Plaintiff admits that it was the news media, and not Cablevision, that released his name. (Am. Compl. ¶¶ 15-16.)

[2] Although outside the scope of the pleading, the Court notes that Defendants assert that there were 150 AMC employees at the time of the Press Release.  (Defs.' Mem. at 9.)